(R.D. 11236)

ALLEN FORWARDING COMPANY *v.* UNITED STATES

Entry Nos. 20828; 31367.

(Decided November 9, 1966)

*Morgan, Lewis & Bockius* (*Arthur R. Littleton* and *John M. Phelan* of counsel) for the plaintiff.

*Barefoot Sanders*, Assistant Attorney General (*Arthur H. Steinberg*, trial attorney), for the defendant.

WILSON, Judge: These two appeals for reappraisement were consolidated for trial. The plaintiff challenges the correctness of the appraised value of certain merchandise invoiced as ⅜-inch Armourplate glass, in sheet sizes of 54½ by 78½ inches and 78½ by 103½ inches. This merchandise was manufactured and exported by Pilkington Brothers, Limited, of St. Helens, England, hereinafter referred to as Pilkington, on or about December 12, 1963, and March 25, 1964, respectively, as indicated in R64/15772 and R65/2763. The invoiced

unit price of the involved glass is $1.89 per square foot regardless of the size of the sheets imported. Appraisement in both appeals was made at the invoiced unit value of $1.89 per square foot, less 2 per centum, packed, less the charges for invoiced ocean freight and insurance.

The plaintiff, while accepting export value as the true basis for appraisal, claims that the true dutiable value of the goods, at the time of exportation, was the entered unit price of $1.89 per square foot, less 2 per centum, packed, less charges for ocean freight and insurance, and less additional deductions for certain alleged quantity and competitive price discounts. Certain deductions of 5, 7½, and 10 per centum are shown on the invoices but are not identified as quantity and competitive price deductions. There is no explanation on the invoices concerning the purpose or meaning of these items claimed as deductible from the appraised value. Plaintiff takes the position that the appraiser did not make a *per se* appraisal in that "he failed to take into consideration the quantity and the competitive price discounts."

The defendant contends that the appraisal was based upon *per se* values and that there is nothing to indicate that the appraiser deducted anything from the amount he found to represent the true dutiable values. In other words, the deductions to which the plaintiff asserts it is entitled had no bearing whatever upon the appraiser's computations in arriving at what is alleged to be the actual market value of the goods at the time of exportation.

Inasmuch as the plaintiff acknowledges export value to be the proper basis for appraisal but asserts that an export value other than that found by the appraiser represents the proper value for dutiable purposes, it is charged with the responsibility or with the burden of proving by competent, persuasive evidence that the claimed dutiable value is the proper basis for appraisement as well as that the official appraisement is erroneous. Counsel for plaintiff, in its brief, acknowledges that plaintiff bears the burden of establishing that all the elements of export value contained in section 402(b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, T.D. 54165, have been established through its proof.

The parties agree that export value is the proper basis for appraisement and that the imported glass is not on the final list, T.D. 54521. The statute with which we are here concerned, section 402(b) of the Tariff Act of 1930, as amended, *supra*, reads as follows:

EXPORT VALUE.—For the purposes of this section, the export value of imported merchandise shall be the price, at the time of exportation to the United States of the merchandise undergoing appraisement at which such or similar merchandise is freely sold or, in the absence of sales, offered for sale in the principal markets of the country of exportation, in the usual wholesale quantities and in the ordinary course of

trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature and all other expenses incidental to placing the merchandise in condition, packed ready for shipment to the United States.

Inasmuch as the plaintiff has conceded that it must establish all the elements of export value, as hereinbefore set forth, to sustain its burden of proof in support of its alleged export value, plaintiff cannot take the position that various elements of the alleged value are severable according to the reasoning set forth in *United States* v. *Fritzsche Brothers, Inc.*, 35 CCPA 60, C.A.D. 371, but must proceed to establish by proof, conforming to all the provisions of the export statute, export value independent of and different from the appraised value. The real issue in this case is, then, whether the plaintiff has fully met its burden of proof so as to establish an export value for the merchandise at bar different from the export value found in the Government appraisal.

The evidence in this case consists of the oral testimony of two witnesses called by plaintiff and three documentary exhibits offered by the plaintiff. The official papers in both appeals were received in evidence without being marked. The defendant offered no evidence.

Edgar P. Perilstein, vice president of H. Perilstein, testified in substance as follows: H. Perilstein was the actual importer of the involved merchandise but entry was made in the name of the plaintiff, a customhouse brokerage firm, for the account of H. Perilstein; that since 1898 his company has been engaged in the business of wholesale glass jobbers and installers; that in 1962 the American producers from whom his company previously bought its merchandise became unable to supply all of H. Perilstein's requirements for certain glass materials; that, therefore, he, the witness, contacted Pilkington, the manufacturer and exporter of the "Armourplate Glass" here under consideration and inquired whether the said company could supply the tempered glass for acrylic casting.

The witness further testified that Pilkington, located in St. Helens, England, maintained a sales office in Toronto, Canada, through which it contacted United States customers. In answer to the Perilstein inquiry concerning Pilkington's ability to supply the necessary merchandise and for a quotation on prices, its Toronto office mailed to Perilstein a letter dated January 15, 1963, plaintiff's exhibit 1. In this letter, the exporter advised Perilstein that it could supply the requirements of that company and quoted certain prices for various sizes of "⅜″ Toughened Plate." These quotations included the price of "189 cents per sq. ft." for the type of ⅜-inch glass here involved. In the same letter, the exporter stated that the quoted prices applied to orders of less than 10,000 square feet, and that "For orders in excess of

10,000 sq. ft. the following rebates apply to sizes in excess of 15 ft. super only.

| | |
|---|---|
| 10,000 ft. up to 25,000 ft. | 5% rebate |
| 25,000 ft. up to 50,000 ft. | 7½% " |
| In excess of 50,000 ft. | 10% " " |

It should be noted that the quoted rebates applied only to "Toughened Plate" ⅜ inch thick.

Mr. Perilstein further testified that, late in 1963, Pilkington reduced its price on "Armourplate Glass" of the type here involved by 5 per centum to meet United States domestic competition. The witness stated that this reduction was communicated to Perilstein by telephone and later confirmed by letter. According to the witness, this was "an over-all reduction in addition to the quantity discounts" (R. 18–19).

Under cross-examination the witness admitted that he did not know what prices were offered by the exporter to any other purchasers. On redirect examination, Mr. Perilstein stated that on December 26, 1963, he reached an agreement with Pilkington to the effect that the quantity discount would be applied on the basis of 50,000 square feet on a cumulative annual basis and not on individual orders. This makes the situation somewhat confusing because it is claimed that the quantity deductions were allowed in anticipation of the quantity purchased being over 50,000 square feet. The situation really becomes further confused by an examination of the involved invoices. On entry 20828 of reappraisement R64/15772 the purchase of 11,169 square feet of glass was shown as qualifying for a quantity discount of 7½ per centum, while on entry 31367, covered by reappraisement R65/2763, a purchase of 1,509 square feet of glass was shown, but the quantity discount of 10 per centum was allowed. Counsel for plaintiff, in its brief, page 13, attempts to explain this inconsistency by pointing out that the total purchases of Perilstein on December 11, 1963, reappraisement R64/15772, exceeded 25,000 square feet but had not reached 50,000 square feet for the year and, consequently, only the 7½ per centum quantity discount was allowed. In explanation of the larger discount allowed on the shipment of March 24, 1964, reappraisement R65/2763, the quantity was 50,000 square feet or more by that date.

These angles of the case are not clarified by the testimony of John Baldry, plaintiff's other witness. This witness, the United States sales manager for Pilkington, had been approximately 14 years at the company's office in St. Helens, England, in the sales department, and for 2 years had been located at Toronto, Canada, from which office he had negotiated sales with United States customers. This witness stated that the same prices as those quoted to Perilstein of Philadelphia, including competitive and quantity purchase rebates, were quoted on such merchandise as here involved to a New York distributor. There

were, according to this witness, in December 1963 and March 1964, three American customers for tempered glass for acrylic manufacture such as the imported merchandise. He also corroborated Mr. Perilstein's testimony to the effect that the exporter herein made a price reduction of 5 per centum to meet American competition. Mr. Baldry further stated that, so far as he knew, Pilkington was the only English manufacturer of such glass as that here involved. When asked by the court concerning the usual wholesale quantity in which the merchandise was sold, the witness testified as follows:

JUDGE WILSON: Was there a usual wholesale quantity in which this merchandise was sold?

THE WITNESS: No. With the three people in this, one can only speculate on the quantities that they use, and there is quite a bit of variation. [R. 69.]

On cross-examination, Mr. Baldry testified as follows:

Q. But the purchasers did buy in different quantities?—A. They bought in very different quantities, yes.

Q. And they paid very different prices?—A. Well, they paid the difference between the rebate shown on page two of the evidence. [Exhibit 1.]

Q. And at the time of exportation there were a number of purchasers?—A. At the time of exportation there were two purchasers in the United States only.

Q. I thought you said there were three?—A. There were two purchasers from Pilkington Brothers Limited.

Q. How many were there for this type of merchandise?—A. That I don't know. I am aware of three acrylic manufacturers of reasonable size, and I am told ——

Q. Three manufacturers in what country?—A. I am told of several others.

Q. Three manufacturers of this merchandise?—A. I beg your pardon, no, no. There are three reasonable sized acrylic sheet manufacturers.

Q. In which country?—A. In the United States, and there are several—I don't know how many—relatively small ones.

Q. How many acrylic sheet manufacturers were there in England during the years 1963 and 1964?—A. I'm sorry, I have no idea, but there are certainly several. [R. 63–64.]

It is elementary of course that there is a presumption of correctness which supports the value returned by the appraiser and that the person challenging the correctness of such value has the double burden of establishing the incorrectness of the official appraisal and of proving another claimed value to be correct. (See *Brooks Paper Company* v. *United States*, 40 CCPA 38, C.A.D. 495; *Kobe Import Co.* v.

*United States*, 43 CCPA 136, C.A.D. 620; and *S. S. Kresge Co. et al. v. United States*, 45 Cust. Ct. 469, Reap. Dec. 9778.)

As hereinbefore indicated, where proper export value is in issue, as in the case at bar, the plaintiff has the burden of showing the claimed export price at which such or similar merchandise was freely sold or, in the absence of sales, offered for sale in the principal markets of the country of exportation, in the usual wholesale quantities and in the ordinary course of trade. The court is clearly of the opinion that this burden has not been fully met.

It is unnecessary to consider the question of severability of any of the elements in the appraisement since counsel for plaintiff concedes in its brief that it is its burden to establish an export value other than that adopted by the appraiser by proving that the value claimed complies with all of the provisions of the export statute.

In support of the contention that plaintiff has established the "usual wholesale quantities" in which such merchandise as that here involved was sold at the time of exportation, counsel in its brief cites the following cases: *United States* v. *Fischer Scientific Company*, 40 CCPA 164, C.A.D. 513 (1953); *Jenkins Brothers* v. *United States*, 25 CCPA 90, T.D. 49093 (1937); *Indussa Corp.* v. *United States*, 47 CCPA 93, C.A.D. 736 (1960). However, the cited cases deal with appraisements on the basis of foreign value and had under consideration former statutes. The statute now in effect provides as follows:

Section 402(f)(5) of the Tariff Act of 1930, as amended, *supra:*

(5) The term "usual wholesale quantities," in any case in which the merchandise in respect of which value is being determined is sold in the market under consideration at different prices for different quantities, means the quantities in which such merchandise is there sold at the price or prices for one quantity in an aggregate volume which is greater than the aggregate volume sold at the price or prices for any other quantity.

The difference between the statute in effect at the time involved in the decisions in the cited cases and the statute now in effect was clearly set forth in the case of *C. J. Tower & Sons of Buffalo, Inc.* v. *United States*, 51 Cust. Ct. 329, 332, 333, Reap. Dec. 10563, decided July 11, 1963, and not appealed, wherein Judge Oliver stated:

Language employed in the foregoing definition imparts to the statutory term, "usual wholesale quantities," a meaning different from that invoked when the term appeared in the provisions of export value, as such value was defined in section 402(d) of the Tariff Act of 1930, * * *:

* * * * * * *

A different standard is established under the statutory definition of the term, section 402(f)(5), as amended, *supra*, as it provides for "usual wholesale quantities" to mean the largest or the greatest quan-

tity in which more merchandise is sold at one price, than any other quantity sold in the aggregate volume.

The older statute was construed to provide for a major portion of sales. The record in the case at bar does not establish any particular quantity in which the imported ⅜ inch or any other size of "Armourplate Glass" was sold during the involved period at the price or prices in aggregate volume which is greater than the aggregate volume sold at the price or prices for any other quantity. Thus the evidence of the exporter herein fails to comply with the provisions of the new statute 402(f)(5), *supra*. Pilkington, from the inception of its business dealings in ⅜-inch Armourplate glass in January 1963, sold varying quantities of Armourplate acrylic glass at varying discounts measured by the square footage, applied on a yearly basis. Plaintiff produced no competent evidence of actual orders showing price and discounts. There is an obvious failure to meet the requirements of the statute presently under consideration by the court.

In *United States* v. *M. Minkus*, 21 CCPA 382, T.D. 46912, involving foreign value under section 402(b) of the Tariff Act of 1922, which was substantially the same as the 1930 act, the court held that no foreign value could be established when the record failed to show which of the quantities between 25 and 10,000 represented the usual wholesale quantities of imported miniature dictionaries. In this case, as in the case at bar, varying quantities were sold with varying discounts. The court also pointed out that the above section did not contemplate more than one market value or price at the same time. The reasoning in the *Minkus* case, *supra*, is applicable here. The court agrees with the contention of the defendant that the application of the varying discounts in the case at bar results in varying or different values depending on the quantities purchased.

In the case of *United States* v. *Hammel, Riglander & Co. et al.*, 16 Ct. Cust. Appls. 37, T.D. 42716, the court held, where the evidence showed a trade discount of 15 per centum was allowed only to wholesalers dealing in certain watch crystals even though said discount was not allowed to other purchasers, that the said discount should be considered in arriving at the appraised foreign value. In the case of *United States* v. *A. W. Faber, Inc.*, 21 CCPA 290, 295, T.D. 46817, the appellate court overruled that particular holding in the *Hammel, Riglander* case, *supra*, stating its position as follows:

It appears from the foregoing that the watch crystals there involved were not freely offered for sale to all purchasers in the usual wholesale quantities, and in the ordinary course of trade, at a discount of 15 per centum from the list price, but that such offers and sales were limited to those who would agree to make purchases aggregating a minimum amount during a year.

We have carefully considered the opinion in said case, and are now convinced that the court was in error in holding that a discount allowed under the facts there found could be considered in arriving at either foreign or export value.

The foregoing quoted language was cited with approval in *Adolph Goldmark & Sons Corp.* v. *United States*, 22 CCPA 358, 361, T.D. 47378.

The court is, therefore, clearly of the opinion that the plaintiff has failed to establish by satisfactory proof the usual wholesale quantities in which such merchandise was sold at the respective dates of exportation.

The court is further of the opinion that the proof does not establish the principal market of the country of exportation at the times in question. To establish the place of manufacture is not proof of the principal market. Whether the home office or one of the other factories of the exporter was the principal market is not clearly shown in the record. Defendant's brief, page 18, correctly states that the record "is silent as to where in the country of exportation the merchandise was *sold* as distinguished from the place where is was manufactured" [italics quoted], citing *United States* v. *Kurt Orban Company, Incorporated*, 51 Cust. Ct. 537, 543, A.R.D. 163.

Since the court finds that the plaintiff has failed to establish the usual wholesale quantities in which the merchandise involved was sold on the dates of exportation and has also failed to meet its burden of proof in establishing the principal market, it is unnecessary to consider the other elements essential to the establishing of an export value since it is the burden of the one challenging the correctness of the appraiser's value to establish each and every one of the elements of export value.

On the record before me, I make the following findings of fact:

1. The merchandise involved in the appeals before the court consists of certain tempered glass invoiced as "Armourplate Glass" which was exported from England in December 1963 and March 1964.

2. The imported merchandise was appraised at the invoiced unit value of $1.89 per square foot, less 2 per centum, packed, less the cost of ocean freight and marine and war insurance, on the basis of export value, as that value is defined in section 402(b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, T.D. 54165.

3. The imported glass was entered at the invoiced unit value, packed, less certain alleged discounts to meet competitive conditions in the United States and for quantity buying. These discounts were claimed in addition to the 2 per centum allowed in the appraisal and also less the ocean freight and insurance.

4. There is no competent evidence to establish any other export value than that found by the appraiser.

5. The proper basis for appraisement is export value, as defined in section 402(b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, T.D. 54165.

From the foregoing facts, the court makes the following conclusions of law:

1. The plaintiff has failed by proper evidence to make out a *prima facie* case for an export value or any other value than that found by the appraiser.

2. The plaintiff has failed to establish by competent evidence the usual wholesale quantity or a single uniform price at which the imported merchandise was freely sold or offered for sale in the usual wholesale quantities different from the appraised values.

3. The plaintiff has failed in both appeals to establish the principal market in England for the involved glass at the date of exportation.

4. The correct appraised value of the merchandise in both appeals is that found by the appraiser.

Judgment will be entered accordingly.